A01A1484. TECUMSEH PRODUCTS COMPANY, INC. v. RIGDON.
(552 SE2d 910)

ELLINGTON, Judge.

Tecumseh Products Company, Inc. appeals from a jury verdict in favor of Wanda Faye Rigdon, who sued the company after she was assaulted by a Tecumseh employee. We find the jury's verdict was supported by evidence at trial and, therefore, affirm the trial court's judgment thereon.

In three enumerations, Tecumseh contends the trial court erred in failing to grant its motions for directed verdicts on Rigdon's claims for negligent rehiring and retention, lost wages, and punitive damages. This contention is without merit.

> Where a jury returns a verdict and it has the approval of the trial judge, the same must be affirmed on appeal if there is any evidence to support it as the jurors are the sole and exclusive judges of the weight and credit given the evidence. The appellate court must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict. As long as there is some evidence to support the verdict, the denial of defendant's motion for directed verdict and new trial will not be disturbed.

(Citations and punctuation omitted.) *Treglown v. K-Mart Corp.*, 245 Ga. App. 428, 429 (537 SE2d 173) (2000).

Viewed in favor of upholding the jury's verdict, the evidence showed that Rigdon worked on Tecumseh's manufacturing assembly line at a station situated next to Dickie Godwin. Rigdon and Godwin exhibited a mutual dislike for one another, exacerbated by Godwin's

tendency to take Rigdon's personal possessions without permission. Rigdon requested that she be transferred away from Godwin, but Tecumseh took no action on the request. On April 6, 1998, Rigdon and Godwin argued, and Godwin threatened to hit Rigdon in the head with an engine cylinder block. The next day, Rigdon arrived at work to find Godwin standing at her station holding her pen. When she reached for the pen, Godwin became enraged, grabbed her right arm, and twisted it, injuring her elbow and bicep.

Godwin testified that he did not touch Rigdon's arm, but simply grabbed a paper towel out of her hand. After a brief investigation, Tecumseh fired both Rigdon and Godwin after finding that the incident was a "mutual affray."

Rigdon sued Tecumseh for negligently rehiring and retaining Godwin. Rigdon contended Tecumseh knew or should have known Godwin was potentially dangerous to other employees because the company fired Godwin after a January 1997 altercation with his supervisor. See Division 1, infra. Rigdon argued that Tecumseh rehired Godwin after he threatened to sue the company for racial discrimination, without conducting a thorough investigation into the previous altercation. Id.

In response, Tecumseh defended the claim by arguing that Rigdon initiated or exaggerated the assault because she was a racist with a grudge against Godwin because he was black. In rebuttal, Rigdon repeatedly denied that she was racist and presented evidence that she had black family members and commuted regularly with black co-workers. Co-workers and other witnesses, including those called by Tecumseh, testified that they had never heard Rigdon make racist comments. And even though Rigdon's racist comments allegedly were made during work hours, Rigdon's employment evaluations are devoid of any complaints or other indications that she had made such remarks.

After hearing the evidence, a jury found in favor of Rigdon and awarded her $306,000 in compensatory damages and $250,000 in punitive damages. Tecumseh appeals from the judgment on the award.

1. Tecumseh contends the trial court erred in denying its motion for directed verdict on Rigdon's negligent rehiring and retention claim. Pursuant to OCGA § 34-7-20, an employer must exercise ordinary care in the selection of employees, must not retain them after "knowledge of incompetency," and must warn other employees of dangers incident to employment that "the employer knows or ought to know but which are unknown to the employee." In order to sustain a claim for negligent hiring and retention, a claimant must show that "the employer knew or should have known of the employee's propensity to engage in the conduct which caused the plaintiff's injury.

Proof of such [propensity] must consist of evidence substantially related to the injury-causing conduct." (Punctuation and footnotes omitted.) *Harper v. City of East Point*, 237 Ga. App. 375, 376 (2) (515 SE2d 623) (1999). Generally, the determination of whether an employer used ordinary care in hiring an employee is a jury issue. See *Sparlin Chiropractic Clinic v. TOPS Personnel Svcs.*, 193 Ga. App. 181-182 (1) (387 SE2d 411) (1989).

In this case, Rigdon presented evidence to support a jury's conclusion that Tecumseh rehired Godwin, even though they should have known of Godwin's propensity to react violently when angry. The evidence showed that Tecumseh fired Godwin in January 1997 after he was involved in a confrontation with his supervisor, Dwight Stigler. Prior to the confrontation, Godwin interrupted a discussion between Stigler and a co-worker. Stigler first told Godwin to go back to work but then, seeing that Godwin was "agitated," instructed him to go home for the evening. When Godwin refused, Stigler called security. Shortly thereafter, Godwin "clinched his fists and leaned towards [Stigler]" in a threatening way. Stigler believed Godwin intended to punch him. Another co-worker, Kelly Carr, testified that when Godwin "lunged" at Stigler, he stepped between the two and prevented any contact. Carr demonstrated Godwin's body movements for the jury and testified that he believed Godwin was going to attack and physically assault Stigler in "some shape, form, or fashion." Stigler notified the company's human resources manager that he believed Godwin was going to physically assault him during the confrontation. Stigler testified that he told the manager that Godwin was a "threat to me. I felt unsafe there working with him, and I knew the safety of others would probably be at risk, too." Stigler also told the manager that, if Godwin was not terminated, he would quit his job at Tecumseh, because "working with [Godwin is] too dangerous." Stigler and Carr prepared and sent memoranda about the incident to their respective supervisors. Stigler's memo stated that "I was very concerned that he might throw a punch and I felt threatened." Tecumseh fired Godwin for refusal to follow instructions and interfering with other employees.

Randy Elrod, a Tecumseh supervisor in charge of human resources and safety, testified that, during the month before the January 1997 encounter, Godwin exhibited significant problems with job performance. Elrod sent a memorandum to company officials in February 1997 which documented these problems. Elrod also testified at trial about Godwin's disrespect for his supervisor, Stigler; his attempts to order other employees around; and his "negative attitude," describing Godwin as "hot headed" and "belligerent."

Tammy Murray, Tecumseh's current employment manager, testified that Godwin's employment record showed two employees had

threatened to quit if Godwin was placed in their department. She also admitted that Godwin's periodic employee evaluations were not in Godwin's personnel folder. Tecumseh could not explain why the evaluations were missing.[1]

Shortly after being fired, Godwin contacted Tecumseh's Director of Operations, Lawrence Dietz, a senior company official in Wisconsin, to complain about his dismissal. Godwin asked to be rehired. Godwin also complained about his dismissal to the Equal Employment Opportunity Commission ("EEOC") and the NAACP, alleging that he was fired due to racial discrimination. Godwin testified that Dietz knew about his EEOC claim, and other evidence showed that Dietz had been told of Godwin's racial discrimination allegations.

In his deposition, Dietz testified that he investigated the January 1997 incident by reviewing the company's records on Godwin, the memoranda from Stigler, Carr, and Elrod, and by speaking to Godwin. Dietz also repeatedly testified that he discussed the January 1997 incident and firing with Stigler and Carr. Both men testified, however, that the official never contacted them about the incident.

Dietz rehired Godwin in August 1997. Dietz repeatedly stated that he believed rehiring Godwin was "justified" and a "good decision." After Tecumseh rehired Godwin, Godwin dropped his discrimination claim.

At trial, Stigler, Carr, and Elrod testified that they would not have rehired Godwin. Tecumseh's former personnel manager testified that she "more than likely" would not have rehired Godwin if it had been her decision due to his threatened violence against his supervisor. She agreed with Murray that it was unusual for Dietz, working in Wisconsin, to rehire an hourly employee in Georgia without seeking her input.

This evidence demonstrates that Tecumseh had both actual and constructive knowledge of Godwin's propensity to lose his temper and become violent. Godwin's confrontation with his supervisor, which most likely would have resulted in an assault but for the intervention of a co-worker, was both similar and substantially related to Godwin's assault on Rigdon. See *Harper v. City of East Point*, 237 Ga. App. at 376 (2) (wherein a series of nonphysical sexual encounters escalated into a sexual assault); cf. *Southern R. Co. v. Roberts*, 206 F2d 508, 512-513 (5th Cir. 1953) (defendant's offensive "pranks" did not evidence a propensity for violence that would put an employer on notice of the potential that defendant would intentionally assault

---

[1] As to spoliation of this evidence, the trial court instructed the jury as follows: "Where a Defendant has evidence by which the Defendant may repel a claim or charge against it and omits to produce it, a presumption arises that the charge or the claim is well founded, but this presumption may be rebutted."

another employee). Further, the evidence showed that, if Tecumseh had undertaken a more thorough investigation into the January 1997 encounter, it would have foreseen that Godwin might become angry and assault a co-worker on the job. The evidence was sufficient to support the jury's verdict that Tecumseh negligently rehired Godwin.

In addition, there was evidence to support a conclusion that Tecumseh negligently retained Godwin in a position where he could be dangerous to other employees. Prior to Godwin's assault on Rigdon, the company had evidence of the January 1997 encounter; Godwin's poor work history and negative attitude; and the adversarial nature of Godwin's relationships with supervisors and co-workers, including Rigdon. Accordingly, the trial court did not err in denying Tecumseh's motion for a directed verdict on Rigdon's negligent rehiring and retention claim. See *Sparlin Chiropractic Clinic v. TOPS Personnel Svcs.*, 193 Ga. App. at 181-182 (1).

2. This same evidence supported the jury's award of punitive damages. In order to award punitive damages, the jury must find that there is clear and convincing evidence that Tecumseh acted in a manner which showed "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to [the] consequences." OCGA § 51-12-5.1 (b). "Conscious indifference to consequences relates to an intentional disregard of the rights of another, knowingly or wilfully disregarding such rights. . . . Wilful and intentional misconduct is not essential." (Citations and punctuation omitted.) *CSX Transp. v. West*, 240 Ga. App. 209, 210-211 (2) (523 SE2d 63) (1999); see also *Hoffman v. Wells*, 260 Ga. 588, 589 (1) (397 SE2d 696) (1990). In this case, the jury could have concluded that Tecumseh wantonly ignored substantial evidence of Godwin's propensity for aggressive or violent behavior, choosing to risk employee safety in order to avoid Godwin's racial discrimination claim.[2] Accordingly, Tecumseh was not entitled to a directed verdict on punitive damages.

3. Tecumseh also contends it was entitled to a directed verdict on the personal injury claim, arguing that the evidence failed to prove Godwin's attack caused Rigdon's injury. The evidence showed, however, that Rigdon did not exhibit any unusual symptoms in her right arm during a pre-employment check-up two months before the assault. Shortly after the assault, a co-worker described Rigdon's arm as "twice the size it was. It had turned blue." See *Jordan v.*

---

[2] Notably, the evidence also supported a conclusion that, at trial, Tecumseh intentionally misrepresented its motivation for rehiring Godwin; fabricated the extent of its investigation of the January 1997 encounter between Godwin and Stigler; and wrongfully labeled Rigdon as a racist out of concern about Godwin's discrimination claim.

*Smoot*, 191 Ga. App. 74, 75 (1) (380 SE2d 714) (1989) (causation may be demonstrated by close proximity in time between an injury and the onset of symptoms). Rigdon reported numbness in her right arm and fingers, radiating pain up her arm, and "tingling" sensations radiating up to her neck.

According to a nurse practitioner who treated Rigdon on May 7, 1998, one month after the assault, Rigdon's arm was "bulged up" with indentations and a "large tumor-looking area." The nurse was unsure if the injury was a muscular hematoma, a pulled muscle, or a torn tendon. The nurse testified that Rigdon had not complained of problems with her right arm prior to the May 1998 visit. Rigdon had an abnormal MRI and another lab test that both indicated fluid in her biceps tendon. An orthopedic surgeon testified that Rigdon had an abnormal "soft-tissue mass" that could have been a lipoma (fatty tumor) or scarring, tenderness, and a little depression around her elbow. According to the surgeon, Rigdon exhibited symptoms of a partial tear of the biceps tendon, tendonitis, or chronic bursitis that could be attributable to someone pulling or twisting her elbow. He testified that these conditions are treated nonsurgically, if possible, and that patients are instructed to avoid grabbing or pulling actions and lifting heavy objects.

Although Tecumseh challenged the medical evidence at trial, the jury is the sole judge of the weight and credibility to be afforded the evidence. OCGA § 24-9-80. As there was evidence to support the jury's conclusion that Godwin's actions caused Rigdon's injury, Tecumseh was not entitled to a directed verdict. Further, because the jury could have found from the evidence that this injury inhibited Rigdon's ability to get a comparable job, the evidence supported her claim for lost wages.

4. Tecumseh asserts the trial court erred in denying its motion for summary judgment. Although the trial court offered to issue a certificate of immediate review, Tecumseh failed to pursue a petition for interlocutory appeal with this Court. "Once a case has been submitted to the jury and a judgment rendered on its verdict, the denial of a summary judgment motion is a moot issue." (Citation omitted.) *Gen. Ins. Svcs. v. Marcola*, 231 Ga. App. 144, 145 (1) (497 SE2d 679) (1998).

*Judgment affirmed. Johnson, P. J., and Ruffin, J., concur.*

DECIDED JULY 25, 2001.

*Jackson, Lewis, Schnitzler & Krupman, David L. Gordon, C. Todd Van Dyke*, for appellant.

*Helms & Helms, Jack J. Helms, Jr., James D. Hudson*, for appellee.