S09G1946. ULTRA TELECOM, INC. et al. v. STATE OF GEORGIA.
S09G1948. ALLSTAR, INC. et al. v. STATE OF GEORGIA.
(701 SE2d 144)

HUNSTEIN, Chief Justice.

We granted certiorari in these cases to address whether the seven video game machines at issue are illegal gambling devices subject to condemnation by the State, as found by the Court of Appeals based on the interpretation it gave to the phrase "a single play" pertaining to the noncash redemption options set forth in OCGA § 16-12-35, *State of Ga. v. Damani*, 299 Ga. App. 112 (681 SE2d 635) (2009), or whether the game machines meet the definition in OCGA § 16-12-35 for coin operated games or devices designed and manufactured for bona fide amusement purposes only, as found by the trial court when it denied the State's petition to condemn these particular machines. For the following reasons, we reverse the Court of Appeals.

1. The State of Georgia, by and through the District Attorney of Cobb County, brought civil condemnation actions against various game machines owned or leased by appellants claiming that they were illegal gambling devices in violation of OCGA § 16-12-20 et seq. By agreement of the parties, the trial court assessed the capabilities of eleven specific machines, as representatives of the whole, and, after making detailed findings of fact as to each machine, applied those facts to its legal construction of OCGA § 16-12-35. The trial court found, inter alia, that seven of the machines[1] were not illegal gambling devices subject to condemnation but instead were bona fide coin operated amusement games. Pertinent to this appeal, the trial court rejected the State's argument that these seven machines were illegal gambling devices because they violated the

---

[1] The seven machines not condemned were (1) Speedmaster, (2) Nudge 'Em, (3) Super Ball, (4) Silver Bar, (5) Peachy Queen, (6) Pick-A-Winner, and (7) a combination machine that was programmed to play three different games (Nudge 'Em, Farm 'Em, and Nuggets of Gold).

noncash redemption option in OCGA § 16-12-35 by exceeding the statutory $5 cap placed on noncash merchandise, prizes, toys, gift certificates, or novelties "received . . . for a single play." Id. at (d) (2). The trial court held that a player "could play a Machine, win points, redeem said points earned in that game, and then play again" or the player could "play a Machine for several plays, allowing the points to accumulate as permitted in [OCGA § 16-12-35] (d) (2), and then redeem[ ] the points in the form of token[s] or tickets for non-cash merchandise not to exceed $5 for a single play." Because each game machine "had a mechanism that determined the number of plays and provided the player with a certificate or voucher for noncash merchandise for $5 per play regardless of the number of points the player accumulated," the trial court found the game machines at issue "per se" complied with the redemption provisions of OCGA § 16-12-35.

The Court of Appeals reversed the trial court as to these seven machines. The majority opinion was based on the holding that the trial court erred as a matter of law as to the legal interpretation it gave the phrase "a single play" in OCGA § 16-12-35. *State of Ga. v. Damani*, supra, 299 Ga. App. at 116 (1) (b). The majority opinion recognized that "[t]he term 'a single play of the game or device' is key to our analysis," id., but noted that "[u]nfortunately, it is not defined in the statute. See OCGA § 16-12-20." Id. It then construed the phrase to mean that a "'single play of the game or device' has occurred when a player cannot continue playing the game machine or device without providing additional consideration" (footnote omitted), id., and concluded, "[i]n short, if the player does not 'cash out' at this point for a prize not to exceed $5 in value, he or she may only use accumulated winnings to start the game anew." Id. at 117. Further, correctly recognizing that the phrase "single play" in OCGA § 16-12-35 (d) (2) must be construed to mean the same as a "single play of the game or device" in OCGA § 16-12-35 (d) (1) (B), *State of Ga. v. Damani*, supra at 117 (1) (b), the Court of Appeals held that "OCGA § 16-12-35 (d) (2) does not allow for the *accumulation* of tokens, vouchers, or tickets in amounts exceeding $5 for a single play of the game or device" (emphasis supplied), id., a conclusion it found necessary to avoid rendering the $5 limitation on noncash merchandise in OCGA § 16-12-35 (d) (1) (B) "meaningless." *State of Ga. v. Damani*, supra at 117 (1) (b).

The Court of Appeals rendered its decision in June 2009 and we granted certiorari in January 2010. While this appeal was pending, the Legislature amended OCGA § 48-17-1, the definitional statute for the revenue chapter governing the taxation of bona fide coin operated amusement machines. That amendment, which was signed

by the Governor on May 26, 2010 and became effective July 1, 2010, contains the following definition:

> (7.1) "Single play" or "one play" means the completion of a sequence of a game, or replay of a game, where the player receives a score and from the score the player can secure free replays, merchandise, points, tokens, vouchers, tickets, or other evidence of winnings as set forth in subsection (c) or (d) of Code Section 16-12-35. A player may, but is not required to, exchange a score for rewards permitted by subparagraphs (A), (B), (C), and (D) of paragraph (d) (1) of Code Section 16-12-35 after each play.

Ga. L. 2010, p. 470/SB 454 § 1. With this amendment to OCGA § 48-17-1, which specifically defines the language in OCGA § 16-12-35 at issue in these appeals, the Legislature clarified its intent as to the meaning of "a single play" both as it pertains to the statutory $5 cap placed on rewards of noncash merchandise, prizes, toys, gift certificates, or novelties in OCGA § 16-12-35 (d) (1) (B) and as to that term's usage in the noncash redemption provision in OCGA § 16-12-35 (d) (2). *State of Ga. v. Damani*, supra, 299 Ga. App. at 117 (1) (b) (OCGA § 16-12-35 (d) (1) and (2) must be read in harmony and "a single play" construed the same in both subsections).[2] It thus appears, by the plain language of this definition, that the Legislature rejected the construction given to the previously-undefined term "a single play" by the majority in the Court of Appeals, i.e., as requiring a player who has accumulated sufficient points to either "cash out" upon completion of a single play or else forfeit any noncash merchandise and additional accumulated points in order to obtain another single play of the game.

> [T]he weight of authority is to the effect that a reviewing court should apply the law as it exists at the time of its judgment rather than the law prevailing at the rendition of the judgment under review, and may therefore reverse a judgment that was correct at the time it was rendered and affirm a judgment that was erroneous at the time, where

---

[2] Contrary to the State's position at oral argument, nothing in the enactment of this definition as part of Title 48 limits its application to that title or precludes its application to Title 16. The State's position is instead contrary to the "'elementary rule of statutory construction' that statutes 'in pari materia,' i.e., statutes relating to the same subject matter, must be construed together." *Willis v. City of Atlanta*, 285 Ga. 775, 776 (2) (684 SE2d 271) (2009). This rule of statutory construction is particularly apt here where the newly enacted OCGA § 48-17-1 (7.1) specifically references OCGA § 16-12-35 as the source for the term "single play" that it is defining.

> the law has been changed in the meantime and where such application of the new law will impair no vested right under the prior law. . . . [Cits.]

(Emphasis omitted.) *City of Valdosta v. Singleton*, 197 Ga. 194, 208 (3) (28 SE2d 759) (1944). Although the trial court did not have the benefit of Ga. L. 2010, p. 470/SB 454 § 1 when it ruled on the State's petition to condemn the game machines at issue, its interpretation of a "single play" is consonant with the Legislature's definition of that term as set forth in this recent legislation. It follows that the Court of Appeals majority erred by reversing the trial court on the basis that it failed to properly interpret a "single play" in OCGA § 16-12-35.

2. In a special concurrence to the Court of Appeals' opinion, Judge Adams disagreed with the majority's definition of "a single play" on the basis that it would necessarily exclude the free replays allowed under OCGA § 16-12-35 (b), (d) (1). *State of Ga. v. Damani*, supra, 299 Ga. App. at 121. However, the special concurrence found the seven game machines at issue to constitute illegal gambling devices based on the language in OCGA § 16-12-35 (d) (2). That subsection provides:

> A player of bona fide coin operated amusement games or devices described in paragraph (1) of this subsection may accumulate winnings for the successful play of such bona fide coin operated amusement games or devices through tokens, vouchers, points, or tickets. Points may be accrued on the machine or device. A player may carry over points on one play to subsequent plays. A player may redeem accumulated tokens, vouchers, or tickets for noncash merchandise, prizes, toys, gift certificates, or novelties so long as the amount of tokens, vouchers, or tickets received does not exceed $5.00 for a single play.

Id. The special concurrence, focusing on the phrase "successful play" in the first sentence of OCGA § 16-12-35 (d) (2), reasoned that players are allowed under the remaining sentences to redeem accumulated tokens, vouchers or tickets received only for each "single play" that is successful. Hence, it concluded that the machines in issue violated this subsection because they allow a player who accumulates a large number of points during one successful play of the game to carry those points over to subsequent games and obtain a "reward" for those games based on the previously-accumulated points even though the player won no points or an insufficient amount of points in those subsequent games.

The special concurrence thus necessarily determined that "successful" modified "play" in the remaining sentences in OCGA § 16-12-35 (d) (2), even though "successful" appears only in the first sentence of that subsection. The Legislature could have but chose not to modify the subsequent references to "play" in OCGA § 16-12-35 (d) (2) with the word "successful." The absence of this modifier lends itself to the reasonable interpretation that subsequent single plays need not be subsequent *successful* single plays in order for a player to redeem noncash merchandise capped at $5 for each subsequent play. It thus appears that two reasonable interpretations exist for the language in subsection (d) (2): one which requires players to be successful in each single game played and the other which allows players to accumulate winnings for the successful play of one single game and then carry over those winnings to subsequent plays without regard to the player's success or lack thereof in those games.

The rules of statutory construction are well established in situations such as these.

> [W]e first note that [OCGA § 16-12-35] is a criminal statute. It thus must be construed strictly against criminal liability and, if it is susceptible to more than one reasonable interpretation, the interpretation most favorable to the party facing criminal liability must be adopted. [Cits.] This rule applies even though a criminal statute is being construed in a civil context. [Cits.]

*Fleet Finance, Inc. v. Jones*, 263 Ga. 228, 231 (3) (430 SE2d 352) (1993). Because the construction given OCGA § 16-12-35 (d) (2) by the special concurrence is not the interpretation most favorable to appellants, who are faced with the condemnation of these game machines by the State on the basis that they are illegal gambling devices, we decline to adopt the special concurrence's interpretation. Applying, as we must, the most favorable interpretation, we hold that OCGA § 16-12-35 (d) (2) does not require success in every single play of the game in order for a player to carry over and redeem points accumulated during an earlier successful play of the machine or device.

3. (a) Although the Court of Appeals did not reach the issue, see *State of Ga. v. Damani*, supra, 299 Ga. App. at 118 (1) (c), our holding above makes it necessary for us to address the State's contention that OCGA § 16-12-35 is not applicable to the game machines at issue and the trial court's ruling should be reversed because the machines are illegal gambling devices as defined in OCGA § 16-12-20

(2) (B), (C) and (D).[3] In particular, the State argues that the trial court erred as a matter of law by holding that a slot machine, as defined in OCGA § 16-12-20 (2) (B), is limited to those types of slot games in which a player wins rewards through "pure chance." The State asserts the trial court should have construed OCGA § 16-12-20 (2) (B) to go beyond the traditional definition of "slot machine" so as to create an absolute prohibition, such that no game or device that possesses slot machine characteristics may ever qualify as a bona fide amusement game or device under OCGA § 16-12-35 even if it requires the exercise of considerable skill in its operation to obtain rewards and complies with the redemption provisions in subsection (d) (2) of that statute. The definition the trial court used, however, was based on this Court's discussion of "slot machine" in OCGA § 16-12-20 (2) (B) in *State of Ga. v. Old South Amusements, Inc.*, 275 Ga. 274, 276 (1), n. 2 (564 SE2d 710) (2002) ("[a] 'slot machine' is a well recognized device for the hazarding of money [cits.]") and our express recognition therein that the terms in OCGA § 16-12-20 (2), including "slot machine," "all possess common meaning . . . [that is] sufficiently definite to put those of common intelligence on notice as to what kinds of amusement machines are prohibited." (Footnote omitted.) *State of Ga. v. Old South Amusements*, supra at 276 (1). The trial court thus did not err by using the long-established common meaning of the term "slot machine," i.e., an apparatus "by which a person depositing money therein may, *by chance*, get directly or indirectly money or articles of value worth either more or less than the money deposited." (Emphasis supplied.) *Elder v. Camp*, 193 Ga. 320, 321 (2) (18 SE2d 622) (1942).

(b) Finally, the State argues that no actual skill is involved in the playing of these games, claiming the skill involved is "illusory" and designed to hide the fact that these are only games of chance. The State's argument must be viewed in light of the Legislature's

---

[3] OCGA § 16-12-20 (2) defines "gambling device" as:

. . .

(B) Any slot machine or any simulation or variation thereof;

(C) Any matchup or lineup game machine or device, operated for any consideration, in which two or more numerals, symbols, letters, or icons align in a winning combination on one or more lines vertically, horizontally, diagonally, or otherwise, without assistance by the player. Use of skill stops shall not be considered assistance by the player; or

(D) Any video game machine or device, operated for any consideration, for the play of poker, blackjack, any other card game, or keno or any simulation or variation of any of the foregoing, including, but not limited to, any game in which numerals, numbers, or any pictures, representations, or symbols are used as an equivalent or substitute for cards in the conduct of such game.

definition of "some skill" as that phrase is used in OCGA § 16-12-35. Subsection (a) clarifies that

[a]s used in this Code section, the term "some skill" means any presence of the following factors, alone or in combination with one another:

(1) A learned power of doing a thing competently;

(2) A particular craft, art, ability, strategy, or tactic;

(3) A developed or acquired aptitude or ability;

(4) A coordinated set of actions, including, but not limited to, eye-hand coordination;

(5) Dexterity, fluency, or coordination in the execution of learned physical or mental tasks or both;

(6) Technical proficiency or expertise;

(7) Development or implementation of strategy or tactics in order to achieve a goal; or

(8) Knowledge of the means or methods of accomplishing a task.

The term some skill refers to a particular craft, coordinated effort, art, ability, strategy, or tactic employed by the player to affect in some way the outcome of the game played on a bona fide coin operated amusement machine as defined in paragraph (2) of Code Section 48-17-1. If a player can take no action to affect the outcome of the game, the bona fide coin operated amusement machine does not meet the "some skill" requirement of this Code section.

The skill level involved in the play of the game machines at issue is unquestionably low. However, as the above-cited language in OCGA § 16-12-35 (a) reflects, the Legislature set the requisite skill level extremely low when it defined "some skill" so as to encompass essentially any action by a player "to affect in some way the outcome of the game played." Id. In light of this definition and the evidence adduced in the record regarding the "skill" involved in playing the game machines in issue, the State cannot show that the trial court's factual findings in this regard are clearly erroneous. See generally *Lyon v. State of Ga.*, 230 Ga. App. 264 (495 SE2d 899) (1998).

4. Our Constitution prohibits gambling, Art. I, Sec. II, Par. VIII (a), and our statutes outlaw illegal gambling devices. OCGA § 16-12-20 et seq. The Legislature, however, has chosen to exclude from these constitutional and statutory bans certain poorly-defined games and deem them "bona fide amusement" games that are legal to play notwithstanding the questionable amusement value of the games, the low level of skill required to play them and the players'

potential to amass multiple "rewards" each worth $5 for very little consideration. However, "the courts are not permitted to concern themselves with the wisdom of an act, . . . but are confined to settled principles of law under the long-established general rule . . . ." *Mayes v. Daniel*, 186 Ga. 345, 350 (1) (198 SE 535) (1938). Because the machines at issue in these appeals meet the definition in OCGA § 16-12-35 for coin operated games or devices designed and manufactured for bona fide amusement purposes only, the Court of Appeals erred by reversing the trial court's holding that these machines are not subject to condemnation by the State.

*Judgment reversed. All the Justices concur, except Hines, Melton and Nahmias, JJ., who dissent.*

MELTON, Justice, dissenting.

Gambling is strictly prohibited under the Georgia Constitution, "and this prohibition shall be enforced by penal laws." Ga. Const. of 1983, Art. I, Sec. II, Par. VIII. In connection with this prohibition, the Legislature has specifically defined the manner in which "a coin operated game or device designed and manufactured for bona fide amusement purposes" may be used without the machine being subject to condemnation by the State as an illegal gambling device. OCGA §§ 16-12-35; 16-12-32. Because the machines at issue here are illegal gambling devices, in that they do not comport with the plain restrictions for "bona fide coin operated amusement games or devices" as defined in OCGA § 16-12-35 (d) (2), I must respectfully dissent from the majority's erroneous conclusion that the State was not entitled to condemn the machines involved here.

OCGA § 16-12-35 (d) (2) provides:

A player of bona fide coin operated amusement games or devices described in paragraph (1) of this subsection[4] may accumulate winnings for the successful play of such bona

---

[4] OCGA § 16-12-35 (d) (1) provides:

Nothing in this part shall apply to a coin operated game or device designed and manufactured only for bona fide amusement purposes which involves some skill in its operation if it rewards the player exclusively with:

(A) Free replays;

(B) Merchandise limited to noncash merchandise, prizes, toys, gift certificates, or novelties, each of which has a wholesale value of not more than $5.00 received for a single play of the game or device;

(C) Points, tokens, vouchers, tickets, or other evidence of winnings which may be exchanged for rewards set out in subparagraph (A) of this paragraph or subparagraph (B) of this paragraph or a combination of rewards set out in subparagraph (A) and subparagraph (B) of this paragraph; or

(D) Any combination of rewards set out in two or more of subparagraph (A), (B), or (C) of this paragraph.

fide coin operated amusement games or devices through tokens, vouchers, points, or tickets. Points may be accrued on the machine or device. A player may carry over points on one play to subsequent plays. A player may redeem accumulated tokens, vouchers, or tickets for noncash merchandise, prizes, toys, gift certificates, or novelties so long as the amount of tokens, vouchers, or tickets received does not exceed $5.00 for a single play.

In construing this statute,

we apply the fundamental rules of statutory construction that require us to construe [the] statute according to its terms, to give words their plain and ordinary meaning, and to avoid a construction that makes some language mere surplusage. At the same time, we must seek to effectuate the intent of the legislature.

(Citations omitted.) *Slakman v. Continental Cas. Co.*, 277 Ga. 189, 191 (587 SE2d 24) (2003). "[U]nder our system of separation of powers this Court does not have the authority to rewrite statutes." *State v. Fielden*, 280 Ga. 444, 448 (629 SE2d 252) (2006). It is not our function to rewrite the law, but to "look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy." OCGA § 1-3-1 (a).

Here, the plain language of the statute is clear. A player "may accumulate winnings for the successful play of [a] bona fide coin operated amusement game[ ] or device[ ] through tokens, vouchers, points, or tickets," and accrued points may be "carr[ied] over . . . on one play to subsequent plays." OCGA § 16-12-35 (d) (2). However, a player may only "redeem *accumulated* tokens, vouchers, or tickets for noncash merchandise, prizes, toys, gift certificates, or novelties so long as the amount of tokens, vouchers, or tickets received *does not exceed $5.00 for a single play*." (Emphasis supplied.) Id. Thus, no matter how many points or tickets are carried over from a prior game, a player cannot legally redeem his or her total sum of accumulated points for any value "exceed[ing] $5.00 for a single play." Id.

In the instant case, however, that is exactly what the machines in question allowed players to do. The example given by the special

---

This subsection shall not apply, however, to any game or device classified by the United States government as requiring a federal gaming stamp under applicable provisions of the Internal Revenue Code or any item described as a gambling device in subparagraph (B), (C), or (D) of paragraph (2) of Code Section 16-12-20.

concurrence in the Court of Appeals is instructive. It is undisputed that, based on the manner in which these machines were designed, a player could win 100 points in his or her initial game, which would be represented as $100 on the game screen, and when the player pressed the redeem button on the machine, he or she would receive a $5 voucher, leaving a balance of $95/points to be carried over to the next game if the player chose to continue playing.

> [Suppose that] the player decided to continue in the second game, and he or she spent another $1 to play. But in this game, the player only won one point/dollar. In other words, the player netted nothing in that game. Nevertheless, the player could hit redeem at this point and receive another $5 voucher. This is so because the game is designed to determine how many *accumulated* points/dollars remain and if sufficient points remain, award another $5 because the player has now played another game. In other words, the computer took some of the "winnings" from game one and paid them out in game two even though the player won nothing in game two. The machine would then know that the player's accumulated winnings has been reduced to $90. A player could then play eight games in a row, for example, winning nothing in each game, then press redeem and receive a voucher for eight times $5, or $40.

(Emphasis supplied.) *State of Ga. v. Damani*, 299 Ga. App. 112, 119-120 (681 SE2d 635) (2009) (Adams, J., concurring specially). In other words, the machines allowed players to redeem their accumulated point totals in an amount that "exceed[s] $5.00 for a single play" in direct violation of the plain language of OCGA § 16-12-35 (d) (2).

In fact, using the same 100 point winner example, at the time that those 100 points were accumulated in a single game, the *present cash value* of those points would far exceed the permissible $5 payout for a single play, because the player would be guaranteed a payout of $5 every time he or she simply put one more dollar in the machine and pressed the redeem button until his or her $100/points were exhausted. Such a scheme runs contrary to the Legislature's expressed intent that accumulated point totals *cannot* be redeemed for an amount in excess of $5 for a single play and would render the constitutional prohibition against gambling meaningless.

Contrary to the majority's contentions, this analysis has nothing to do with the interpretation of the phrase "successful play" in OCGA § 16-12-35 (d) (2). The relevant inquiry here is not whether subsequent plays after the initial play that led to an accumulation of

points must be "successful," but whether one can legally *redeem* his or her total *accumulated points* for a value that exceeds $5 for a single play. Id. The Legislature has made clear that this cannot be done, and one need not read the word "successful" into any other line of the statute for this to be the case. Id.

Because the machines in question allow players to redeem accumulated points for a value in excess of $5 for a single play, they are not "bona fide coin operated amusement games or devices," but rather, illegal gambling devices that are subject to condemnation by the State. Id. See also OCGA § 16-12-32. I therefore respectfully dissent from the majority.

I am authorized to state that Justice Hines and Justice Nahmias join in this dissent.

DECIDED OCTOBER 4, 2010 —
RECONSIDERATION DENIED NOVEMBER 1, 2010.

*Wimberly, Lawson, Steckel, Nelson & Schneider, Les A. Schneider, Paul Oliver, McNatt, Greene & Peterson, Hugh B. McNatt, Spix, Krupp & Reece, Mark V. Spix, Manchel, Wiggins & Kaye, Howard J. Manchel*, for Ultra Telecom, Inc. et al.

*McNatt, Greene & Peterson, Hugh B. McNatt, Begner & Begner, Alan I. Begner, Balch & Bingham, Michael J. Bowers, Christopher S. Anulewicz, Geremy W. Gregory*, for Allstar, Inc. et al.

*Patrick H. Head, District Attorney, Amelia G. Pray, Christopher W. Timmons, Samuel W. Lengen, Assistant District Attorneys*, for the State.