**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**July 11, 2012**

# In the Court of Appeals of Georgia

A12A0200.  AMUSEMENT  SALES,  INC.  v.  STATE  OF
GEORGIA.

BARNES, Presiding Judge.

In this civil *in rem* forfeiture action arising out of allegations of illegal commercial gambling at a convenience store, the jury found in favor of the State of Georgia, resulting in the forfeiture of eight electronic game machines and a portion of the money found in those machines to the State. The trial court entered judgment on the jury verdict, and Amusement Sales, Inc., the owner of the machines, now appeals. In several enumerations of error, Amusement Sales contends that it was entitled to judgment as a matter of law because the State failed to demonstrate that illegal commercial gambling had occurred, and because it had no actual or constructive knowledge of the alleged gambling. Amusement Sales further contends

that the trial court erred in denying its motion to disqualify the special assistant district attorneys ("SADAs") appointed to prosecute the action on a contingency fee basis. Lastly, Amusement Sales contends that the trial court erred in its charge to the jury on the "innocent party" defense.

As discussed below, we reject Amusement Sales's contention that it was entitled to judgment as a matter of law on the State's forfeiture claim. However, we conclude that contingency fee arrangements for SADAs appointed to represent the State in civil forfeiture actions violate Georgia public policy, given that those types of arrangements cause the SADAs to have a personal financial stake in the outcome of the proceedings. Consequently, we agree with Amusement Sales that its motion to disqualify should have been granted, and, as a result, we reverse the judgment and remand the case for a new trial. In the interest of judicial economy, we also address the trial court's jury charge on the "innocent party" defense and conclude that a different charge should be given on retrial.

The pertinent factual and procedural history is as follows. Pursuant to Georgia's Racketeer Influenced and Corrupt Organizations Act (the "RICO Act"), OCGA § 16-14-1 et seq., the State of Georgia filed a complaint in the Superior Court of Emanuel County, alleging that a local convenience store known as KT's Place had

2

made illegal cash payouts to customers who played electronic game machines located on the premises. The State alleged that the machines were gambling devices, that the store was being operated as a gambling place, and that the felony crime of commercial gambling had repeatedly occurred on the premises in violation of OCGA § 16-12-22. The State further alleged that the criminal acts of commercial gambling constituted a pattern of racketeering activity under OCGA § 16-14-3 (8) (A) and (9) (A) (xvii). Based upon these allegations in the complaint, the State sought *in rem* forfeiture of eight electronic game machines and money seized from those machines by law enforcement officials on the ground that the property was "used or intended for use in the course of, derived from, or realized through the foregoing pattern of racketeering activity."[1] OCGA § 16-14-7 (a).

The complaint was filed on behalf of the State by Andrew J. Ekonomou and Michael G. Lambros, whom the District Attorney for the Middle Judicial Circuit of Georgia had appointed as SADAs to pursue the State's forfeiture claims against a number of convenience stores. The SADAs were in private practice and entered into

---

[1] The State also sought forfeiture against two defendants (the convenience store and its owner) *in personam*, but those claims were dismissed after the two defendants reached a settlement with the State.

3

a contingency fee arrangement with the State to prosecute and recover a percentage of any forfeited proceeds.

Amusement Sales answered the complaint and made a claim for the property seized from the convenience store. Amusement Sales leased the electronic game machines to the store and claimed ownership of the machines and the money seized from them. According to Amusement Sales, the machines were bona fide coin-operated amusement machines under OCGA §§ 16-12-35 (d) and 48-17-1 (2) rather than gambling devices, and it was an innocent party that had no actual or constructive knowledge of illegal cash payouts made to store customers. Consequently, Amusement Sales asserted that the machines and money were not subject to forfeiture and should be returned to it by the State.

Amusement Sales also filed a motion to disqualify the SADAs from prosecuting the case, contending that their contingency fee arrangement created an impermissible conflict of interest and that Emanuel County had never properly approved of their appointment or compensation. The trial court denied the motion, and the case proceeded to a jury trial, with SADA Lambros serving as lead attorney for the State.

4

Piyush Patel, the owner and operator of the convenience store, testified at trial as a State's witness. He conceded that he knew that customers playing the eight electronic game machines inside his store were supposed to be rewarded exclusively with non-cash gift merchandise when they won a game. Patel admitted, however, that he instead rewarded winning customers with illegal cash payouts on a daily basis for at least two years prior to the seizure of the machines by law enforcement. According to Patel, the highest single cash payout he made to a customer was $500. He further testified that he purchased gift merchandise from Amusement Sales for use in his store only one time during the years that the machines were located there.

Robert Jue, an employee of Amusement Sales, described for the jury how the electronic game machines inside the convenience store were played. Jue testified that the machines would show combinations of "fruit or numbers" on wheels spinning on the screen, and a player would insert cash into the machine to play and punch a button to stop the wheels. The player would win or lose based on the combination of symbols appearing on the screen once the wheels stopped. According to Jue, a player would just punch the button on the machine, "and whatever comes up[,] comes up."

Jue was in a position to know how the machines were played because he traveled to the convenience store every other week to collect 30 percent of the net

5

profits from the machines, the amount owed to Amusement Sales under its arrangement with the store. To determine the amount of net profits owed to Amusement Sales, Jue would print out an "audit ticket" from each of the machines and "add up the net profit" shown on the tickets. Although Jue claimed that he was unaware that Patel allowed customers to redeem their winnings for cash rather than gift merchandise, he conceded that he ignored all information on the audit tickets pertaining to the issue of winnings. Jue admitted that he did not "bother" with reviewing that type of information because his "job [was] just to collect 30 percent for the company on net profit."

The owner of Amusement Sales, Rudolph Bairas, also testified. He testified that the eight electronic game machines in the convenience store netted a profit of $331,658 in cash over a thirteen-month period. The net profit was divided between Amusement Sales, which received 30 percent, and the store, which received 70 percent. Bairas denied having any knowledge that cash payouts were being made to customers who played the machines at the store. But, he admitted that audit tickets pertaining to the machines had been thrown away because he did not "have any use for [them]," and that Amusement Sales had routinely "zeroed out" the machines and

6

had changed the internal operating boards on them "quite often," resulting in the loss of the gaming history otherwise stored on the machines.

At the close of the State's case-in-chief and again at the close of trial, Amusement Sales moved for a directed verdict, and the trial court denied the motions. After hearing all of the testimony, the jury returned a verdict in favor of the State. The trial court thereafter entered judgment on the verdict reflecting that the machines and money contained in them had been forfeited to the State. Amusement Sales now appeals.[2]

1. Amusement Sales contends that it was entitled to judgment as a matter of law because the State failed to prove that the crime of commercial gambling occurred at the convenience store, and thus failed to prove the predicate acts necessary for establishing a RICO violation. Amusement Sales further contends that it was an innocent party as a matter of law because it was without actual or constructive knowledge of any commercial gambling occurring at the store. Accordingly,

---

[2] Amusement Sales filed its notice of appeal from the verdict and judgment on October 26, 2010, but the trial court did not actually enter judgment on the verdict until September 12, 2011. Although Amusement Sales's notice of appeal was premature, "[a] prematurely filed notice of appeal is treated as effective upon the filing of the order or judgment appealed." (Citation and punctuation omitted.) *Mitchell v. Cancer CarePoint*, 299 Ga. App. 881, 882, n. 1 (683 SE2d 923) (2009). See *Gillen v. Bostick*, 234 Ga. 308, 310-311 (1) (215 SE2d 676) (1975).

Amusement Sales contends that the trial court erred in denying its motions for directed verdict.

> Where a jury returns a verdict and it has the approval of the trial judge, the same must be affirmed on appeal if there is any evidence to support it as the jurors are the sole and exclusive judges of the weight and credit given the evidence. The appellate court must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict. As long as there is some evidence to support the verdict, the denial of defendant's motion for directed verdict . . . will not be disturbed.

(Citations and punctuation omitted.) *Tecumseh Products Co. v. Rigdon*, 250 Ga. App. 739 (552 SE2d 910) (2001).

Under Georgia's RICO Act, "[a]ll property of every kind used or intended for use in the course of, derived from, or realized through a pattern of racketeering activity is subject to forfeiture to the [S]tate." OCGA § 16-14-7 (a). A "pattern of racketeering activity" means engaging in at least two predicate acts of racketeering activity. See OCGA § 16-14-3 (8) (A); *Aon Risk Svcs., Inc. of Ga. v. Commercial & Military Sys. Co.*, 270 Ga. App. 510, 516 (5) (b) (607 SE2d 157) (2004).

Criminal acts of commercial gambling can serve as the predicate acts forming a pattern of racketeering activity. See OCGA § 16-14-3 (9) (A) (xvii). "A person commits the offense of commercial gambling when he intentionally . . . [o]perates or participates in the earnings of a *gambling place*." (Emphasis supplied.) OCGA § 16-12-22 (a) (1). "Gambling place" is defined as "any real estate, building, room, tent, vehicle, boat, or other property whatsoever, one of the principal uses of which is . . . the playing of *gambling devices*." (Emphasis supplied.) OCGA § 16-12-20 (3).

(a) Amusement Sales maintains that the State failed to demonstrate that the eight machines in the convenience store were "gambling devices," and, therefore, was unable to establish any predicate acts of commercial gambling. According to Amusement Sales, the uncontroverted evidence showed that the machines instead were "coin operated game[s] or device[s] designed and manufactured only for bona fide amusement purposes." OCGA § 16-12-35 (d) (1). See also OCGA § 48-17-1 (2).

The definition of "gambling device" includes:

(A) Any contrivance which for a consideration affords the player an opportunity to obtain money or other thing of value, the award of which is determined by chance even though accompanied by some skill, whether or not the prize is automatically paid by contrivance;

. . .

9

(C) Any matchup or lineup game machine or device, operated for any consideration, in which two or more numerals, symbols, letters, or icons align in a winning combination on one or more lines vertically, horizontally, diagonally, or otherwise, without assistance by the player. Use of skill stops shall not be considered assistance by the player . . . .

OCGA § 16-12-20 (2) (A), (C).

As previously discussed, Robert Jue, Amusement Sales's employee with personal knowledge regarding the eight machines in the convenience store, testified that a player of the machines inserted cash into the machine to play, punched a button to stop the wheels from spinning, and whatever combination of symbols happened to appear on the game once the wheels stopped spinning would determine whether the player would win or lose. In other words, a player would simply punch the button on the machine, "and whatever comes up[,] comes up." Jue's testimony was sufficient to authorize the jury to find that the eight machines fell within the definition of "gambling devices." See OCGA § 16-12-20 (2) (A), (C). See also OCGA § 24-4-8 ("The testimony of a single witness is generally sufficient to establish a fact."). Although Rudolph Bairas, owner of Amusement Sales, provided a different description of how the machines were played, it was for the jury, not this Court, to

10

assess witness credibility and resolve conflicts in the evidence. See OCGA § 24-9-80; *Tecumseh Products Co.*, 250 Ga. App. at 739.

We likewise reject Amusement Sales's argument that the uncontroverted evidence showed that the eight machines were bona fide coin-operated amusement machines rather than gambling devices. To qualify as a bona fide coin-operated amusement machine, the machine must "involve[] some skill in its operation." OCGA § 16-12-35 (d) (1). See also OCGA § 48-17-1 (2) (among other requirements, a "bona fide coin[-]operated amusement machine" is one "whose operation depends in whole or in part upon the skill of the player"). Based upon Jue's description of the eight machines and how they were played, the jury was entitled to find that the machines did not involve "some skill" in how they were operated. See OCGA § 16-12-35 (a) (defining "some skill"); *Patel v. State*, 289 Ga. 479, 485 (3) (713 SE2d 381) (2011) (where evidence showed that "a player simply pressed a button to play the[] machines," the machines were not bona fide coin-operated amusement machines because they did not involve "some skill" in their operation).

Nevertheless, Amusement Sales maintains that the eight machines were legal per se because they were "Silver Bar" machines, and the Georgia Supreme Court determined that machines that went by that same name were bona fide coin-operated

11

amusement machines rather than gaming devices in *Ultra Telecom v. State of Georgia*, 288 Ga. 65, n. 1 (701 SE2d 144) (2010). Amusement Sales, however, makes no effort to show that res judicata or collateral estoppel principles apply in this context. Furthermore, there is nothing in the record reflecting that Amusement Sales programmed the machines at issue here with the same specific game as the machines in *Ultra Telecom.* Additionally, the Supreme Court in *Ultra Telecom* affirmed, under the clearly erroneous standard, the trial court's *factual finding* that the machines at issue involved "some skill," id. at 71 (3) (b), and, therefore, the appeal was in an entirely different posture than the instant one, where the jury found that the machines did *not* involve "some skill."

For these reasons, the jury was entitled to find that the eight machines at the convenience store were gambling devices rather than bona fide coin-operated amusement machines. The trial court thus did not err in denying Amusement Sales's motion for a directed verdict on this ground.[3]

---

[3] In a related enumeration of error, Amusement Sales asserts that the uncontroverted evidence showed that the criminal acts committed at the store did not constitute the felony crime of commercial gambling, but rather the misdemeanor offense of giving a cash reward to a customer playing a bona fide coin-operated amusement machine. See OCGA § 16-12-35 (g). Amusement Sales's assertion is unpersuasive, given that there was evidence from which the jury could find that the eight machines at the store constituted gambling devices rather than bona fide coin-

(b) Amusement Sales also argues that it was entitled to a directed verdict because there was no evidence that the playing of gambling devices was "one of the principal uses" of the convenience store. Hence, Amusement Sales claims that the store did not meet the definition of a "gambling place," one of the required elements for proving the crime of commercial gambling as alleged in the present litigation. See OCGA §§ 16-12-20 (3); 16-12-22 (a) (1).

During the trial, Bairas testified that the eight electronic game machines in the convenience store generated a net profit of $331,658 in cash in a thirteen-month period, which translated into a net profit of approximately $6,378 in cash per week. At the time of the seizure of the machines by law enforcement, the convenience store had approximately $38,000 in cash on hand, which represented total cash sales from all of the store's operations for the previous week, reflecting that cash from gaming activity made up a significant amount of the cash sales of the business in a given week. Moreover, Patel, the owner of the store, testified that he made cash payouts to customers playing the machines every day for two years. Based upon this combined testimony, the jury was authorized to find that the playing of gambling devices was one of the principle uses of the convenience store, and thus that the store met the operated amusement machines.

13

definition of a "gambling place." The trial court therefore committed no error in denying Amusement Sales's motion for a directed verdict on this issue.

(c) Amusement Sales further maintains that it was an innocent party without actual or constructive knowledge that cash payouts were being made to customers at the convenience store. Consequently, Amusement Sales contends that it did not forfeit its interest in the machines and the money seized from them, and that the trial court thus should have granted a directed verdict in its favor.

In the context of an *in rem* RICO forfeiture action, where the property itself is the named defendant, the focus is on whether the property "was used or intended for use in the course of, derived from, or realized through a pattern of racketeering activity," OCGA § 16-14-7 (a), and the State can pursue such an action "without regard to the guilt or innocence of the property owner." *Cisco v. State*, 285 Ga. 656, 661 (1) (680 SE2d 831) (2009). Yet, the RICO Act provides that "[t]he interest of an innocent party in the property shall not be subject to forfeiture," and it defines such a party as "one who did not have actual or constructive knowledge that the property was subject to forfeiture." OCGA § 16-14-7 (j). While the Act does not define "constructive knowledge," that term is commonly understood to refer to "[k]nowledge

that one using reasonable care or diligence should have, and therefore that is attributed by law to [that] person." Black's Law Dictionary, 9th Edition (2009).

OCGA § 16-14-7 (a) and (j), when construed together, create a burden-shifting framework for *in rem* RICO forfeiture actions. Specifically, once the State shows, by a preponderance of the evidence, that the property "was used or intended for use in the course of, derived from, or realized through a pattern of racketeering activity" under OCGA § 16-14-7 (a), the burden then shifts to the property owner to show that he "did not have actual or constructive knowledge that the property was subject to forfeiture" under OCGA § 16-14-7 (j). Cf. *Walker v. State*, 281 Ga. App. 526, 529 (1) (b) (636 SE2d 705) (2006). See *Cisco*, 285 Ga. at 661 (1) (citing *Walker* with approval when discussing in rem RICO forfeiture proceedings).

Applying this framework to this case, we conclude that even if Amusement Sales had no actual knowledge of the commercial gambling occurring at the convenience store, the jury was entitled to reject Amusement Sales's contention that it had no constructive knowledge of that activity. There was evidence that despite the fact that the eight game machines in the convenience store generated a net profit of $331,658 in cash in a thirteen month period, the store purchased gift merchandise from Amusement Sales for use only one time during the years that the machines were

15

located there. Given the amount of profit generated from the machines without any concomitant purchase of gift merchandise, the jury was authorized to find that Amusement Sales should have known that the store was rewarding winning customers with cash rather than gift merchandise.

The jury's finding of constructive knowledge was further supported by Jue's testimony about his failure to review the audit tickets from the machines for information about winnings, as well as Bairas's testimony that the audit tickets were thrown away on a regular basis, that the machines were routinely "zeroed out," and that the operating boards on the machines were often replaced, preventing analysis of the gaming history otherwise stored on the machines. Given this evidence, the jury was entitled to reject the "innocent party" defense raised by Amusement Sales, and a directed verdict on this issue would not have been appropriate.

2. Apart from its claims regarding the denial of its motions for directed verdict, Amusement Sales argues that the trial court erred in denying its motion to disqualify the SADAs from prosecuting the case. "There are two generally recognized grounds for disqualification of a prosecuting attorney. The first such ground is based on a conflict of interest, and the second ground has been described as 'forensic misconduct.'" (Citation omitted.) *Williams v. State*, 258 Ga. 305, 314 (2) (B) (369

16

SE2d 232) (1988). In reviewing a trial court's ruling on a motion to disqualify a prosecutor, we apply an abuse of discretion standard. *Head v. State*, 253 Ga. App. 757, 758 (2) (560 SE2d 536) (2002).

"A conflict of interest . . . has been held to arise where the prosecutor has acquired a personal interest or stake in the defendant's conviction." *Williams*, 258 Ga. at 314 (2) (B). If the assigned prosecutor has acquired a personal interest or stake in the conviction, the trial court abuses its discretion in denying a motion to disqualify him, and the defendant is entitled to a new trial, even without a showing of prejudice. See *Whitworth v. State*, 275 Ga. App. 790, 796 (1) (d) (622 SE2d 21) (2005) (physical precedent only). See also *Young v. United States*, 481 U.S. 787, 809-814 (III) (B) (107 SC 2124, 95 LE2d 740) (1987) (plurality opinion as to Division (III) (B)).

It is true that the present case involves forfeiture of property rather than a criminal prosecution. Nonetheless, "[f]orfeiture is a quasi-criminal proceeding that permanently extinguishes a property owner's rights to certain property," *State v. Williams*, 278 Ga. 447, 449 (603 SE2d 278) (2004), and "forfeiture of property is disfavored." *General Motors Acceptance Corp. v. State of Ga.*, 279 Ga. 328, 331 (613 SE2d 641) (2005). Hence, we conclude that, as in a criminal prosecution, no showing of prejudice should be required if the prosecutor assigned to a forfeiture proceeding

17

has acquired a personal interest or stake in the outcome, and the trial court erroneously denies a motion for disqualification. Cf. *Pitts v. State of Ga.*, 207 Ga. App. 606, 607 (1) (428 SE2d 650) (1993) (Fourth Amendment exclusionary rule applicable in criminal cases also should be applied in forfeiture proceedings because of their quasi-criminal nature). That is the situation here, given that the SADAs who prosecuted this case entered into a contingency fee arrangement with the State to prosecute and recover a percentage of any forfeited proceeds.

In the recent case of *Greater Georgia Amusements, LLC v. State of Georgia*, __ Ga. App. __ (2) (Case No A12A0692, decided on May 25, 2012) (physical precedent only), this Court held that contingency fee arrangements for SADAs appointed to represent the State in civil forfeiture actions violate Georgia public policy because they cause an appointed prosecuting attorney to have a personal financial stake in the outcome of the proceedings.[4] As a result, this Court held that the trial court erred in failing to disqualify the SADA appointed under such an

---

[4] We also note that the General Assembly recently passed Senate Bill 181, which was signed into law by the Governor on May 2, 2012. The bill adds a new code section, OCGA § 16-1-12, which prohibits an SADA appointed in a forfeiture action from being compensated on a contingency basis by a percentage of the assets that arise or are realized from the forfeiture action. See *Greater Ga. Amusements, LLC*, __ Ga. App. __ (2), n. 1.

arrangement from prosecuting the civil forfeiture case. See *id.* Although *Greater Georgia Amusements, LLC* is not binding precedent, see Court of Appeals Rule 33 (a), we nevertheless find its reasoning persuasive. See *Pechin v. Lowder*, 290 Ga. App. 203, 205 (659 SE2d 430) (2008) ("[P]hysical precedent may be cited as persuasive authority, just as foreign case law or learned treatises may be persuasive.") (citation and punctuation omitted).

It follows that the trial court abused its discretion in denying Amusement Sales's motion for disqualification. And because disqualification was warranted in light of the SADAs having a personal financial stake in the outcome, Amusement Sales need not show prejudice arising from the denial of its motion. See *Young*, 481 U.S. at 809-814 (III) (B); *Whitworth*, 275 Ga. App. at 796 (1) (d). We therefore reverse the trial court's judgment entered on the verdict and remand for a new trial. See *Davenport v. State*, 157 Ga. App. 704, 706 (1) (278 SE2d 440) (1981).[5]

---

[5] As an alternative ground for disqualification, Amusement Sales argues that the district attorney lacked authority to appoint the SADAs in this case because the governing authority of Emanuel County never properly approved of their appointment as required by OCGA § 15-18-20. The same argument was raised by the defendants and rejected by this Court in *Greater Georgia Amusements, LLC*, __ Ga. App. at __ (1). Again, we find this Court's reasoning in *Greater Georgia Amusements, LLC* to be persuasive.

3. Amusement Sales claims that the trial court erred in its charge to the jury on the "innocent party" defense. In the first sentence of its jury charge addressing that defense, the trial court instructed that "[a]ny person claiming an innocent interest in any property from which the State has presented a case for forfeiture must prove he had neither actual nor constructive knowledge that the property was subject to forfeiture." However, in the second sentence of its charge, the trial court used language derived from the drug forfeiture statute, OCGA § 16-13-49 (e) (1) (A), and instructed: "An owner of property subject to forfeiture is innocent where that party is not legally accountable for the conduct giving rise for its forfeiture, did not consent to it, and did not know and could not reasonably have known of the conduct, or that it was likely to occur."[6] Amusement Sales contends that the trial court erred by including in its charge the language from the drug forfeiture statute defining an innocent party as one "not legally accountable for the conduct giving rise for its

---

[6] OCGA § 16-13-49 (e) (1) (A) provides:
(e)(1) A property interest shall not be subject to forfeiture under this Code section if the owner of such interest or interest holder establishes that the owner or interest holder: (A) Is not legally accountable for the conduct giving rise to its forfeiture, did not consent to it, and did not know and could not reasonably have known of the conduct or that it was likely to occur . . . .

20

forfeiture" and as one who "did not consent to it," because that language went beyond the RICO Act requirement that the innocent party be one "who did not have actual or constructive knowledge that the property was subject to forfeiture." OCGA § 16-14-7 (j).

It is well-settled that "a jury charge must be adjusted to the evidence, apt, and a correct statement of the applicable law." (Punctuation and footnote omitted.) *Wood v. B & S Enterprises*, 314 Ga. App. 128, 130 (1) (723 SE2d 443) (2012). During the retrial of this case, to avoid any potential for confusing or misleading the jury, the trial court should not include in its charge on the "innocent party" defense the language derived from the drug forfeiture statute. The trial court instead should charge the jury using language derived form OCGA § 16-14-7 (j), the definition of "constructive knowledge" set forth in Division 1 (c) of this opinion, and the description of the applicable burden-shifting framework set forth in that same division.[7]

*Judgment reversed and case remanded for new trial. Adams and McFadden, JJ., concur.*

---

[7] Because we concluded in Division 2 that a new trial is necessary in this case, we need not determine whether the trial court's inclusion of language from the drug forfeiture statute harmed Amusement Sales.