S10F0874. NORMAN v. AULT.
(695 SE2d 633)

CARLEY, Presiding Justice.

In 2008, James A. Norman filed a "complaint for declaratory relief, conversion and damages" against Debbie Jean Ault. In her answer, Ms. Ault counterclaimed for divorce, alimony, and an equitable division of the parties' assets and debts. The trial court entered a temporary order requiring Norman to pay Ms. Ault temporary alimony in the amount of $2,000 per month until further order of the court. At a bifurcated trial in April 2009, a jury found, among other things, that the parties were married by common law in Alabama and that Ms. Ault was entitled to $54,000 in lump sum alimony to be paid in monthly installments over a period of three years. The trial court entered a final divorce decree on October 22, 2009, nunc pro tunc to April 7, 2009.

On November 19, 2009, the trial court held a hearing on a motion for contempt filed by Ms. Ault. Immediately afterwards, Norman filed a notice of appeal purportedly from "the order and judgment of the Court finding and holding [him] in contempt." On November 20, Norman filed an application for discretionary review of the final divorce judgment. The trial court entered an order on December 1, 2009, nunc pro tunc to November 19, 2009, holding Norman in contempt for failure to pay alimony since the trial. Thereafter, we granted the application for discretionary appeal pursuant to our Pilot Project in divorce cases, and Norman filed a timely notice of appeal from the divorce decree.

1. Norman contends that the jury's verdict that a common law marriage existed is not supported by any evidence.

> No common-law marriage shall be entered into in this state on or after January 1, 1997. Otherwise valid common-law marriages entered into prior to January 1, 1997, shall not be affected by this Code section and shall continue to be recognized in this state.

OCGA § 19-3-1.1. However, Ms. Ault relied on the law of Alabama to support her claim of a common law marriage. "A party who intends to raise an issue concerning the law of another state or of a foreign country shall give notice in his pleadings or other reasonable written notice." OCGA § 9-11-43 (c). Ms. Ault did so by means of the pre-trial order. See *Alto Park Super Mart v. White*, 216 Ga. App. 285, 286 (1), fn. 1 (454 SE2d 580) (1995).

Ms. Ault's reliance on Alabama law was necessary, as "[i]t is a familiar principle of the common law that the lex loci is the general rule adhered to by Courts, in ... questions of marriage...." *Eubanks v. Banks*, 34 Ga. 407, 415 (1) (1866). "Marriage being considered a civil contract, its validity will be judged by the law of the forum in which it was made, in this case [Alabama]. [Cit.]" *Fisher v. Toombs County Nursing Home*, 223 Ga. App. 842, 843 (1) (479 SE2d 180) (1996). See also OCGA § 19-3-43. Compare *Bell v. Bell*, 206 Ga. 194, 198 (56 SE2d 289) (1949).

Thus, Georgia, like other states not generally recognizing common law marriages, will recognize as valid a common law marriage established under the laws of another state. *Anderson v. Anderson*, 577 S2d 658, 660 (Fla. App. 1991) (following this rule with respect to Georgia prior to this state's abolition of common law marriages); *Johnson v. Lincoln Square Properties*, 571 S2d 541, 543 (Fla. App.

1990); 55 CJS, Marriage, § 6; 52 AmJur2d, Marriage, § 70. OCGA § 19-3-1.1

> is limited to marriages occurring in [Georgia] and was never intended to affect persons lawfully married outside of [Georgia]. If it were so, then the statute would have the effect of converting lawful marriages into adulterous relationships and bastardizing children from those relationships.

*Johnson v. Lincoln Square Properties*, supra.

Accordingly, we turn to a consideration of the law of Alabama with respect to common law marriage.

> The court, in determining such law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the rules of evidence. The court's determination shall be treated as a ruling on a question of law.

OCGA § 9-11-43 (c).

Unlike Georgia, "Alabama has not revoked the right [of common law marriage], and [it] continues to exist in [that] state. [Cit.]" 1 Crittenden and Kindregan, *Alabama Family Law* § 1:4. The elements of a common law marriage in Alabama are as follows:

> " '1) capacity; 2) present, mutual agreement to permanently enter the marriage relationship to the exclusion of all other relationships; and 3) public recognition of the relationship as a marriage and public assumption of marital duties and cohabitation.' " [Cit.]

*Buford v. Buford*, 874 S2d 562, 566 (Ala. Civ. App. 2003). See also *Creel v. Creel*, 763 S2d 943, 946 (Ala. 2000). These elements may be " 'either explicitly expressed or implicitly inferred from the circumstances . . . .' [Cit.]" *Buford v. Buford*, supra.

Norman argues that Ms. Ault never presented any evidence of a present intent to be married. However, " '(n)o specific words of assent are required' and . . . 'present intention is inferred from cohabitation and public recognition.' [Cit.]" *Buford v. Buford*, supra. "The husband's subjective intent, i.e., any unexpressed intent he may have had not to be married, must yield to the reasonable conclusion to be drawn from his objective acts . . . ." *Crosson v. Crosson*, 668 S2d 868, 870 (I) (2) (Ala. Civ. App. 1995).

> " '[P]ublic recognition . . . may be made in any way which

can be seen and known by men, *such as* living together as man and wife, treating each other and speaking of each other in the presence of third parties as being in that relation, and declaring the relation in documents executed by them whilst living together, such as deeds, wills, and other formal instruments. . . .' " [Cit.] (Emphasis in original.)

*Downs v. Newman*, 500 S2d 1062, 1063 (Ala. 1986) (quoting *Maryland v. Baldwin*, 112 U. S. 490, 495 (5 SC 278, 28 LE 822) (1884)).

Although conflicting, the evidence, when construed in support of the jury's verdict, shows that in 1989, three years after Norman's divorce, Ms. Ault began living in Alabama in the same home as Norman, sharing a bedroom, and doing housework. The parties would tell people that the other was his or her spouse, and Norman would tell Ms. Ault "[a]ll the time" that "in God's eyes, you are my wife." Norman had sexual relations only with Ms. Ault. In 1998, before the parties moved to Georgia, Norman executed a deed filed in Alabama conveying property to himself, his daughter, and "Wife, Debbie J. Norman." These signs "satisfy enough of the 'aforementioned criteria generally indicative of public recognition' to determine that [Norman] assented to the marriage. [Cit.]" *Buford v. Buford*, supra at 567.

The fact that the parties "executed some documents listing themselves as not married will not necessarily defeat a common-law marriage when other evidence supports an inference that they were publicly recognized as married. [Cit.]" 1 Crittenden, supra (citing *Downs v. Newman*, supra). Furthermore, although Ms. Ault's testimony indicated that the parties never got around to a ceremonial marriage, " '(t)he intent to participate in a marriage ceremony in the future does not prove a couple's nonmarriage.' [Cit.]" *Crosson v. Crosson*, supra at 872 (II) (1).

Relying on Georgia law, Norman argues that, prior to Ms. Ault's move to Alabama and before his divorce, they had an illicit relationship which must be presumed to continue on the same basis. Although the rule of lex loci controls all substantive matters, "[t]he rule of 'lex fori controls all matters affecting only the remedy, such as rules of evidence, methods of shifting the burden of proof, and the presumptions arising from given states of fact. (Cit.)' [Cit.]" *Menendez v. Perishable Distrib.*, 254 Ga. 300, 302 (329 SE2d 149) (1985). Under the latter rule, the following law of Georgia is controlling:

"While it is the rule that cohabitation, illicit in its inception, will be presumed to have so continued throughout the period of cohabitation, yet if, after the disability of the parties has been removed by lapse of time or otherwise, the

cohabitation is continued, and the parties thereafter hold themselves out as man and wife, if the original illegal cohabitation was had in the absence of an attempted ceremonial marriage, a new and valid agreement of marriage will be presumed to have been entered upon, in the absence of anything appearing to the contrary." [Cits.]

*Brown v. State*, 208 Ga. 304, 306 (1) (a) (66 SE2d 745) (1951).
" ' "(I)f there is any evidence to support (the finding of a common law marriage), an appellate court should so construe the evidence to uphold the verdict." ' [Cit.]" *In re Estate of Love*, 274 Ga. App. 316, 317 (618 SE2d 97) (2005).

The existence of a common-law marriage is a question for the trier of fact. [Cits.] The trier weighs the credibility of witnesses and the weight of the evidence. [Cit.] If there is any evidence to support the finding of no marriage, the decision must be upheld. [Cits.]

*In re Estate of Wilson*, 236 Ga. App. 496, 498 (1) (512 SE2d 383) (1999). "The jury is the final arbiter of credibility and conflicts. [Cit.] While the evidence here is conflicting, the jury was authorized to conclude that a common law marriage existed. [Cit.]" *In re Estate of Love*, supra at 319 (1).

2. Norman also contends that, during the first phase of the bifurcated trial, the trial court erred in admitting evidence regarding the parties' conduct after moving to Georgia, because the only issue at that phase was whether they entered into a common law marriage while they lived in Alabama. This evidentiary question is controlled by Georgia law. *Menendez v. Perishable Distrib.*, supra. However, we may look to persuasive authority which is consistent with the law of this state.

" 'Georgia law favors the admission of any relevant evidence, no matter how slight its probative value may be, and, on the balance, evidence of even doubtful relevance should be admitted(,)' [cit.] and its weight should be left to the jury. [Cit.]" *In re Estate of Love*, supra at 321-322 (4). Although the parties' cohabitation and public recognition of their marriage in Georgia could not establish a common law marriage, these facts could corroborate other evidence of a prior agreement to marry entered into in Alabama. Once evidence of "a marriage contract is presented, evidence that the parties acted in a manner consistent with such an agreement, and that the community believed such an agreement existed, is relevant to the issue whether the contract actually existed." *In re Estate of Garges*, 378 A2d 307, 310 (II), fn. 8 (Pa. 1977). See also *In re Estate of Love*, supra at 322 (4).

3. Norman urges that the trial court improperly limited certain cross-examination of Ms. Ault by telling counsel that his questioning would open the door to evidence regarding the trial court's temporary ruling in this case. However, Norman's attorney withdrew the question at issue and, when the trial court stated that there is a better way to ask the question, he stated "I got it" and proceeded with his cross-examination.

" '(A) litigant cannot submit to a ruling or acquiesce in the holding, and then complain of the same on appeal. He must stand his ground. Acquiescence deprives him of the right to complain further.' (Cits.) Accordingly, we find nothing for us to review based on the posture of the trial record regarding this particular enumeration of error." [Cit.]

*Wright v. State*, 220 Ga. App. 233, 235 (5) (469 SE2d 381) (1996) (where trial court sustained the objection and permitted the question to be asked in a different way, and counsel responded that he would withdraw the question).

4. Norman asserts that the trial court incorrectly failed to credit his pre-trial payments of temporary alimony against the final award. He relies only on authority which permits a credit for payments of temporary alimony which became due during the pendency of an appeal from the final judgment of divorce. *DuBois v. DuBois*, 250 Ga. 271, 272 (297 SE2d 277) (1982). But see *McDonald v. McDonald*, 234 Ga. 37, 38 (3) (214 SE2d 493) (1975). However, even assuming that Norman is correct with respect to temporary alimony paid while the final divorce decree is on appeal, any such rule does not apply to pre-trial payments of temporary alimony.

The jury's verdict in deciding the final divorce issues cannot affect the provisions of the temporary order, which was still in effect. [Cit.] . . . "Upon the hearing of the application for temporary alimony, the merits of the case are not in issue. (Cits.)"

*Thompson v. Thompson*, 259 Ga. 817-818 (388 SE2d 514) (1990). Thus, the verdict and judgment on a jury trial for a final divorce constitute neither res judicata nor an estoppel preventing the obligee spouse from recovering the full amount of temporary alimony which became due prior to the final judgment. *Thompson v. Thompson*, supra at 818. Consequently, the obligor spouse clearly is not entitled to credit for any pre-trial payments of temporary alimony, so long as the temporary award has not expired of its own terms, been revoked or modified, or been otherwise rendered ineffective as provided by

law. See Dan E. McConaughey, *Ga. Divorce, Alimony and Child Custody* § 8:14 (2009-2010 ed.). Contrary to Norman's assertion, therefore, the trial court was not authorized to give him credit for his pre-trial payments of temporary alimony.

5. Norman further contends that the trial court erroneously entered the final judgment "nunc pro tunc" to April 7, 2009 and ordered monthly installments of lump-sum alimony to begin on June 1, 2009, almost five months before entry of the judgment.

> The trial court had authority to enter a divorce decree nunc pro tunc as of [that prior] date ... where the jury had previously returned a verdict and the cause was ripe for judgment. "(E)very court has the inherent power — and it is the court's duty — to correct its own records to make them speak the truth. [Cits.] Where based solely on the record, and without the necessity for the introduction of extrinsic evidence, the court may, on its own motion and without notice, enter such judgment and decree nunc pro tunc at a later date; and since such entry simply perfects the record, as between the parties it relates back to the time when it should have been entered, although a different rule would apply to sureties, intervening bona fide purchasers, or innocent third parties. [OCGA § 15-1-3 (6)] ...." [Cit.] "Under the Civil Practice Act all judgments are signed by the judge, and filed with the clerk. No time limit is given for such signing and filing. [OCGA § 9-11-58.] The present record contains no facts which would prevent the entry of a judgment on the verdict of the jury at a subsequent term." [Cit.]

*Moore v. Moore*, 229 Ga. 600, 601 (2) (193 SE2d 608) (1972), overruled on other grounds, *McCauley v. McCauley*, 259 Ga. 72 (377 SE2d 676) (1989). Compare *Banciu v. Banciu*, 282 Ga. 616, 619 (3) (652 SE2d 552) (2007) (where judgment ordering that alimony and child support commence on dates prior to the trial was clerical error which had to be corrected on remand); *Coleman v. Coleman*, 240 Ga. 417, 418 (1) (240 SE2d 870) (1977). Indeed, entry of the judgment nunc pro tunc and commencement of lump-sum alimony soon after the verdict was advantageous to Norman, as the monthly payments thereof were $500 less than the monthly amount of temporary alimony.

6. The trial court's order holding Norman in contempt is also enumerated as error. However, that order was not entered until December 1, 2009, well after entry of judgment and filing of the application for discretionary appeal. The separate notice of appeal

from the contempt order could not have been deemed timely until that date, regardless of the fact that it was entered nunc pro tunc to the day before the application was filed. *Rocha v. State*, 287 Ga. App. 446, 447 (1) (a), fn. 1 (651 SE2d 781) (2007); *Boatright v. Sunshine Toyota*, 177 Ga. App. 332 (339 SE2d 275) (1985). Moreover, that separate appeal was not proper in the absence of compliance with the discretionary appeal procedures set forth in OCGA § 5-6-35 (a) (2). No application seeking discretionary review of the contempt order has ever been filed in this Court.

Furthermore, the record does not contain any transcript of the contempt hearing, and nothing else in the record shows that the entry nunc pro tunc was used for the proper purpose of "recording that which had been decreed but not recorded or correctly recording that which had been decreed but misrecorded." *In re H. L. W.*, 244 Ga. App. 498, 499 (535 SE2d 834) (2000). See also *Beatty v. Underground Atlanta*, 237 Ga. 844 (1) (229 SE2d 615) (1976). Even if the entry nunc pro tunc was proper and the contempt order is treated as having been entered on November 19, 2009, that entry was still subsequent to the final divorce decree. Thus, the contempt order is not prior to or contemporaneous with that final judgment such that it can be enumerated in this case pursuant to OCGA § 5-6-34 (d). Instead, it is a subsequent ruling which Norman is not entitled to enumerate. " " "(J)udgments (can)not be considered (on appeal) . . . (if) rendered . . . subsequent to the judgment appealed from. (Cit.)" [Cit.]' " *Hester v. Human*, 211 Ga. App. 351, 352 (1) (439 SE2d 50) (1993).

The enumeration in this case which addresses the contempt order is not predicated upon a proper and timely "appeal from that order or from any other appealable order which encompasses that subsequent ruling. Accordingly, we have no jurisdiction to consider the" contempt order. *Costanzo v. Jones*, 200 Ga. App. 806, 811 (3) (409 SE2d 686) (1991).

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 7, 2010.

*Perotta, Cahn & Prieto, James A. Meaney III*, for appellant.
*Larry B. Hill*, for appellee.