S11A0044. PATEL et al. v. STATE OF GEORGIA et al.
S11A0045. HANDY CHECK et al. v. STATE OF GEORGIA et al.
S11A0239. DUDHWALA et al. v. STATE OF GEORGIA et al.
S11A0240. PATEL et al. v. STATE OF GEORGIA et al.
S11A0241. MEHTA et al. v. STATE OF GEORGIA et al.

(713 SE2d 381)

HINES, Justice.

These appeals arise from trial court orders granting preliminary injunctions and appointing receivers to take control of the assets of certain stores and operate them. For the reasons that follow, we affirm in part, reverse in part, and remand.

On March 8, 2010, the State of Georgia, ex rel. Hayward Altman, District Attorney for the Middle Judicial Circuit, brought these five civil actions under the Georgia Racketeer Influenced and Corrupt Organizations Act ("RICO"). See OCGA § 16-14-1 et seq. In each of the five cases, the State filed a virtually identical complaint; the State named as in personam defendants the purported owners and operators of the stores.[1] The complaints also named as in rem

---

[1] In Case No. S11A0044, the complaint named as in personam defendants Parimal H. Patel, individually, and Parimal H. Patel d/b/a Yogi Food Mart. In Case No. S11A0045, the complaint named as in personam defendants Sanjay Patel, individually and d/b/a Handy Check. In Case No. S11A0239, the complaint named as in personam defendants Zubin A. Dudhwala individually and d/b/a Pennywise Convenience Store, and Mike Patel. In Case No. S11A0240, the complaint named as in personam defendants Ankurkumar G. Patel and Sunfly, LLC d/b/a Sunfly Convenience Store. In Case No. S11A0241, the complaint named as in personam defendants Hershkumar Mehta, individually, and Hershkumar Mehta d/b/a Main Street Grocery.

defendants the real property comprising the stores, as well as currency, electronic gaming devices, and other personal property seized from the stores on the same day that the complaints were filed. The complaints alleged that the in personam defendants each engaged in two or more acts of illegal commercial gambling by operating, and participating in the earnings of, a gambling place in violation of OCGA § 16-12-22, in that they permitted customers of the respective stores to play electronic gaming devices located on the premises, with winnings paid out in cash; it was alleged that this constituted racketeering activity under OCGA § 16-14-3 (8) and (9). The complaints sought relief provided for in OCGA § 16-14-6 (a). The complaints also requested injunctive relief, and alleged that the in personam defendants had possessed and controlled personal and real property which were used to further the racketeering activities, and which had been obtained or derived through those unlawful acts, and that, unless enjoined, the in personam defendants would conceal and dispose of such property. The complaints also requested that receivers be appointed to take control of the in rem property named in the complaints, as well as the named businesses "along with money . . . and funds directly traceable to and derived from criminal activity." Citing OCGA § 16-14-7, the State also sought forfeiture of the property identified as in rem defendants, as well as any other property used for, or derived from, the racketeering activities.

After an ex parte hearing on March 8, 2010, the trial court granted temporary restraining orders, prohibiting the in personam defendants and those acting with them from, among other things, disposing of any of the documents or assets of the businesses. The court also appointed a temporary receiver in each case who was authorized to manage and take control of the assets of the respective businesses.[2]

The defendants all moved to dissolve the temporary restraining orders, remove the temporary receivers, and dismiss the complaints; the State moved for orders granting interlocutory injunctions and to continue the receiverships. After a hearing on April 6-7, 2010, addressing all five of these cases, as well as other similar cases, the trial court entered orders on April 19, 2010,[3] granting the State's motions for interlocutory injunctions, which continued in effect the terms of the temporary restraining orders; the court also continued the receiverships. The defendants appealed.

1. In *Cisco v. State of Ga.*, 285 Ga. 656, 658 (680 SE2d 831) (2009), this Court held that the in personam RICO forfeiture

---

[2] In each case, the court appointed John Flanders Kennedy to act as receiver.

[3] The trial court's orders state that they are entered nunc pro tunc April 6, 2010.

provision of OCGA § 16-14-7 (m), was unconstitutional in that, despite OCGA § 16-14-7 (a)'s description of forfeiture as a "civil procedure," OCGA § 16-14-7 (m) imposed a criminal penalty without the required constitutional safeguards. The defendants argue that the opinion also effectively declared unconstitutional all RICO civil remedies other than in rem forfeiture, including the granting of the interlocutory injunctions and creation of the receiverships at issue here. But, this is not so.

*Cisco* decided only the constitutionality of OCGA § 16-14-7 (m); it did not purport to rule on any other statutory provision. Rather, *Cisco* specifically distinguished the constitutional safeguards found in RICO in rem forfeiture provisions from the in personam provision it addressed. *Cisco*, supra at 663 (3) ("OCGA § 16-14-7 (m) lacks all of the procedural safeguards seen in our federal and sister state counterparts and expressly rejects even the minimum safeguards provided elsewhere in OCGA § 16-14-7 for in rem RICO forfeiture proceedings."). And, *Cisco* examined the historical role of in rem and in personam forfeitures, and noted the distinctions. In an in rem proceeding,

> the physical object itself is treated as the offender, without regard for the owner's conduct. [In contrast, when a forfeiture is in personam, and hence against a person, the proceeding is] criminal because it require[s] proof of the guilt of the owner. . . . Thus, unlike in rem forfeiture of guilty property, which descends from one historical tradition, in personam forfeitures are criminal forfeitures from a different historical tradition. Such forfeitures have historically been treated as punitive, being part of the punishment imposed for felonies and treason in the Middle Ages and at common law.

Id. at 659 (1) (Citations and punctuation omitted.) Clearly, *Cisco* does not purport to declare unconstitutional the in rem forfeiture proceedings found in OCGA § 16-14-7 (a)-(l) & (n). Here, the trial court's orders of April 19, 2010, specifically stated that the injunctions and receiverships were being continued to prevent "property allegedly acquired through a pattern of racketeering activity [from being] returned into the stream of commerce." Such property is subject to in rem forfeiture, OCGA § 16-14-7 (a), (c), and the remedies pursued here are consistent with such forfeiture proceedings.

Nor does *Cisco* address the remedies of injunction and receivership themselves. Since that opinion was issued, this Court has recognized that in a RICO action, a trial court may properly exercise

its discretion to appoint a receiver and enjoin the parties who would otherwise control property that is the subject of an in rem forfeiture proceeding; indeed, that has been acknowledged in a case arising from facts virtually identical to those in these cases. See *Pittman v. State of Ga.*, 288 Ga. 589, 592-593 (2) (706 SE2d 398) (2011).[4] That these remedies are pursued in conjunction with an in rem forfeiture proceeding does not convert them into the equivalent of the in personam forfeiture provided in OCGA § 16-14-7 (m); under OCGA § 16-14-7 (m), the criminal guilt of an in personam defendant, and punishment, would be at issue. *Cisco*, supra at 660 (1). But such is not at issue here. What is at stake in an interlocutory injunction and receivership action is the application of equitable principles for the protection of the parties. *Pittman*, supra. In fact, under OCGA § 16-14-6 (b), the remedies of injunction and receivership are available to "[a]ny aggrieved person," not only to the State, which is inconsistent with such remedies being considered criminal matters.[5] See also OCGA § 16-14-9.[6] In contrast, "[a] RICO forfeiture proceeding is not an available avenue for Georgia's aggrieved citizens but is a proceeding that can only be initiated by the State pursuant to OCGA § 16-14-7." *Cisco*, supra at 660-661 (1).

Further, the procedures surrounding the orders granting the interlocutory injunctions and continuing the receiverships did not violate due process; the defendants were afforded the opportunity to present evidence, cross-examine witnesses, and present arguments. Compare *Cousins v. Macedonia Bapt. Church of Atlanta*, 283 Ga. 570 (662 SE2d 533) (2008).

2. The trial court rejected the defendants' oral motions that the in rem forfeitures sought constituted excessive fines, in violation of the Eighth Amendment to the Constitution of the United States. In

---

[4] *Pittman* involved a complaint also filed on March 8, 2010, by the same District Attorney, asserting the same RICO violations, and was the subject of an order filed on April 9, 2010, by the same judge as in the five cases now on appeal.

[5] OCGA § 16-14-6 (b) reads:

Any aggrieved person or the state may institute a proceeding under subsection (a) of this Code section. In such proceeding, relief shall be granted in conformity with the principles that govern the granting of injunctive relief from threatened loss or damage in other civil cases, provided that no showing of special or irreparable damage to the person shall have to be made. Upon the execution of proper bond against damages for an injunction improvidently granted and a showing of immediate danger of significant loss or damage, a temporary restraining order and a preliminary injunction may be issued in any such action before a final determination on the merits.

[6] OCGA § 16-14-9 reads:

The application of one civil remedy under this chapter shall not preclude the application of any other remedy, civil or criminal, under this chapter or any other provision of law. Civil remedies under this chapter are supplemental and not mutually exclusive.

*Howell v. State of Ga.*, 283 Ga. 24, 26 (1) (656 SE2d 511) (2008), this Court stated that excessiveness claims are to be evaluated

> in terms of the following considerations: (1) the harshness, or gross disproportionality, of the forfeiture in comparison to the gravity of the offense, giving due regard to (a) the offense committed and its relation to other criminal activity, (b) whether the claimant falls within the class of persons for whom the statute was designed, (c) the punishments available, and (d) the harm caused by the claimant's conduct; (2) the nexus between the property and the criminal offenses, including the deliberate nature of the use and the temporal and spatial extent of the use; and (3) the culpability of each claimant.

This is the standard the trial court applied. But, in doing so, the trial court specifically noted that there was no evidence before it as to the cost of any in rem forfeiture to the claimants, and therefore such value was unknown. That is correct; at the time of its April 19, 2010 orders, the court had not entered any orders of forfeiture or, in fact, been presented with inventories of what property might be subject to forfeiture. "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish. [Cits.]" *United States v. Bajakajian*, 524 U. S. 321, 334 (III) (A) (118 SC 2028, 141 LE2d 314) (1998). Without any findings as to the amounts of the prospective forfeitures, the trial court's consideration of the question of in rem forfeitures constituting unconstitutionally excessive fines was premature, and the cases must be remanded for consideration of those issues when properly presented.[7] Compare *Howell*, supra at 25, in which the value of the forfeited property was determined.

3. The defendants also assert that the evidence presented at the hearing of April 6-7, 2010, did not demonstrate a pattern of racketeering activity in any of the subject stores. See OCGA § 16-14-3 (8) (A) & (9) (A) (xvii). However, evidence was introduced, as to each store, that a confidential informant ("C.I.") entered the store, played a video gaming machine, and received a ticket redeemed for cash or

---

[7] We note that the trial court's order states that it had "received no evidence to controvert a finding of Defendants' culpability under OCGA § 16-12-22. Without a comment upon any such culpability, it would appear the third [*Howell* factor] also favors a finding of constitutionality under the circumstances of this case." Proper application of the *Howell* test requires a full consideration of culpability, which will usually require an affirmative finding as to whether there is culpability on the part of any claimant, and the extent thereof. See *Howell*, supra at 25 & 27 (1).

other consideration.[8] See OCGA § 16-12-22.

Defendants nonetheless contend that not all of these instances can serve as predicate acts under RICO because not all represent "winning" events by the players, in that they did not produce payouts greater than that initially placed into the machines. However, illegal gambling is not contingent upon a player winning, but upon the opportunity for a player to win. See OCGA § 16-12-20 (1), (2) (A).[9] Defendants also contend that the machines at issue are

---

[8] As to Case No. S11A0044, the evidence was that on October 26, 2009, a C.I. after inserting $10 into a video gaming machine, and playing it for a few minutes, received from the machine a printed ticket, which the C.I. took to the store cash register and exchanged for $15. On another occasion within six months before the hearing of April 6-7, 2010, a C.I., after inserting money into a video gaming machine, and playing it for a few minutes, received from the machine a printed ticket, which the C.I. took to the store cash register and exchanged for an amount greater than $5; during that six-month period, he played a second time, but did not receive a ticket to redeem.

As to Case No. S11A0045, the evidence was that on December 16, 2009, a C.I., after inserting $40 into a video gaming machine, and playing it for a few minutes, was given $15 worth of gasoline by the store, and returned $30 of the original $40 to investigating law enforcement personnel. On December 17, 2009, a C.I., after inserting $40 into a video gaming machine, and playing it for a few minutes, received from the machine a printed ticket, which the C.I. took to the store cash register and exchanged for $5. On December 22, 2009, a C.I., after inserting $50 into a video gaming machine, and playing it for a few minutes, received from the store $25 in store credit, and returned $20 of the original $50 to investigating law enforcement personnel.

As to Case No. S11A0239, the evidence was that on October 8, 2009, a C.I., after inserting $20 into a video gaming machine, and playing it for a few minutes, received from the machine a printed ticket, which the C.I. took to the store cash register and exchanged for $10. On October 12, 2009, a C.I., after inserting $10 into a video gaming machine, and playing it for a few minutes, received from the machine a printed ticket, which the C.I. took to the store cash register and exchanged for $15. On October 21, 2009, a C.I., after inserting $20 into a video gaming machine, and playing it for a few minutes, received from the machine a printed ticket, which the C.I. took to the store cash register and exchanged for $15. On February 11, 2010, a C.I., after inserting $20 into a video gaming machine, and playing it for a few minutes, received from the machine a printed ticket, which the C.I. took to the store cash register and exchanged for $5.

As to Case No. S11A0240, the evidence was that on October 6, 2009, a C.I., after inserting $20 into a video gaming machine, and playing it for a few minutes, received from the machine a printed ticket, which the C.I. took to the store cash register and exchanged for $25. On October 20, 2009, a C.I., after inserting $20 into a video gaming machine, and playing it for a few minutes, received from the machine a printed ticket, which the C.I. took to the store cash register and exchanged for $10. On October 23, 2009, a C.I., after inserting $15 into a video gaming machine, and playing it for a few minutes, received from the machine a printed ticket, which the C.I. took to the store cash register and exchanged for $15. On February 3, 2010, a C.I., after inserting $40 into a video gaming machine, and playing it for a few minutes, received from the machine a printed ticket, which the C.I. took to the store cash register and exchanged for $5.

As to Case No. S11A0241, the evidence was that on October 8, 2009, a C.I., after inserting $20 into a video gaming machine, and playing it for a few minutes, received from the machine a printed ticket, which the C.I. took to the store cash register and exchanged for $10. On October 29, a C.I., after inserting $20 into a video gaming machine, and playing it for a few minutes, received from the machine a printed ticket, which the C.I. took to the store cash register and exchanged for $10.

[9] OCGA § 16-12-20 reads in pertinent part:
(1) "Bet" means an agreement that, dependent upon chance even though accompanied by some skill, one stands to win or lose something of value. . . .

"designed and manufactured only for bona fide amusement purposes," and thus are outside the definition of commercial gambling. See OCGA § 16-12-35 (d) (1).[10] However, there is no evidence that any of the machines at issue "involves some skill in its operation" as required under OCGA § 16-12-35 (d) (1); the sole evidence was that a player simply pressed a button to play these machines. See *Ultra Telecom, Inc. v. State of Ga.*, 288 Ga. 65, 71 (3) (b) (701 SE2d 144) (2010). Further, as the State notes, even property that is lawful to possess and operate can be used to violate the law, and thus would be subject to forfeiture under the RICO statute if it is used in racketeering activity. See OCGA § 16-14-7 (a).[11]

4. Although the defendants assert that the court did not conduct a balancing of the equities when deciding to issue the interlocutory injunctions and continue the receiverships, the record belies this contention; the court's order on the interlocutory injunctions and continuation of the receiverships recited the equitable arguments of the parties, and concluded that the situation required the injunctions and receiverships. There was no abuse of the trial court's discretion regarding these decisions. *Pittman,* supra at 592-593 (2).

5. On April 7, 2010, the defendants filed motions to recuse Judge Kathy S. Palmer, who was presiding over the RICO cases of all

---

(2) "Gambling device" means:

    (A) Any contrivance which for a consideration affords the player an opportunity to obtain money or other thing of value, the award of which is determined by chance even though accompanied by some skill, whether or not the prize is automatically paid by contrivance; . . .

[10] OCGA § 16-12-35 (d) (1) reads:

    (d) (1) Nothing in this part shall apply to a coin operated game or device designed and manufactured only for bona fide amusement purposes which involves some skill in its operation if it rewards the player exclusively with:

    (A) Free replays;

    (B) Merchandise limited to noncash merchandise, prizes, toys, gift certificates, or novelties, each of which has a wholesale value of not more than $5.00 received for a single play of the game or device;

    (C) Points, tokens, vouchers, tickets, or other evidence of winnings which may be exchanged for rewards set out in subparagraph (A) of this paragraph or subparagraph (B) of this paragraph or a combination of rewards set out in subparagraph (A) and subparagraph (B) of this paragraph; or

    (D) Any combination of rewards set out in two or more of subparagraph (A), (B), or (C) of this paragraph.

This subsection shall not apply, however, to any game or device classified by the United States government as requiring a federal gaming stamp under applicable provisions of the Internal Revenue Code or any item described as a gambling device in subparagraph (B), (C), or (D) of paragraph (2) of Code Section 16-12-20.

[11] OCGA § 16-14-7 (a) reads:

    All property of every kind used or intended for use in the course of, derived from, or realized through a pattern of racketeering activity is subject to forfeiture to the state. Forfeiture shall be had by a civil procedure known as a RICO forfeiture proceeding under the following rules.

defendants, contending that the fact that she had signed the arrest and search warrants in the criminal prosecutions of the individual defendants indicated that she had already formed an opinion regarding the facts that underlay the civil proceedings, and had already decided that there was probable cause to believe that the predicate acts alleged in the civil RICO complaints had, in fact, occurred. The trial court did not refer the matters to another judge, but denied the motions, ruling that the accompanying affidavits did not set forth facts that, if true, would warrant recusal.[12] See Uniform Superior Court Rule 25.3.[13] Doing so was not error.

Although these civil RICO proceedings are separate from any criminal proceedings, the argument advanced in the motions to recuse is akin to an assertion that, because a trial judge presiding in an action issues a ruling that implicates the merits of the case, that judge must be recused from acting further in the case. However, "[i]n order to be disqualifying the alleged bias must stem from an extra-judicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *Birt v. State*, 256 Ga. 483, 485 (4) (350 SE2d 241) (1986) (Citations and punctuation omitted.) The only bases for the motions to recuse were the judicial rulings issued in the related criminal matters; there were no assertions of bias stemming from an extra-judicial source.

> [S]imply because the judge had approved [a prior] order in [a connected] case would not show bias or prejudice so as to prevent his reviewing his action fairly and impartially. Otherwise, no judge could ever rule on a motion to reconsider a previous order. Here the only bias alleged in the affidavit was that the judge, based on what he learned in the [criminal] evidentiary hearing, had previously ruled adversely to appellants' interests.

---

[12] We need not address the trial court's ruling that the motion was untimely when first made orally at the hearing from which recusal was sought; counsel averred that he did not know until that hearing that the same judge who was presiding over the civil proceedings had acted upon the criminal arrest and search warrants.

[13] Uniform Superior Court Rule 25.3 reads:

When a judge is presented with a motion to recuse, or disqualify, accompanied by an affidavit, the judge shall temporarily cease to act upon the merits of the matter and shall immediately determine the timeliness of the motion and the legal sufficiency of the affidavit, and make a determination, assuming any of the facts alleged in the affidavit to be true, whether recusal would be warranted. If it is found that the motion is timely, the affidavit sufficient and that recusal would be authorized if some or all of the facts set forth in the affidavit are true, another judge shall be assigned to hear the motion to recuse. The allegations of the motion shall stand denied automatically. The trial judge shall not otherwise oppose the motion.

*Liberty Mut. Ins. Co. v. Johnson*, 244 Ga. App. 338, 339 (1) (535 SE2d 511) (2000). Accordingly, the affidavits were "legally insufficient, [and] the judge correctly denied the motion[s] to recuse." Id.[14]

*Judgments affirmed in part and reversed in part, and case remanded. All the Justices concur, except Hunstein, C. J., who dissents.*

HUNSTEIN, Chief Justice, dissenting.

The majority characterizes the temporary restraining order at issue, which was continued by the trial court's grant of the State's motion for interlocutory injunction, as prohibiting the in personam defendants from "among other things, disposing of any of the documents or assets of the businesses." Op. at. 480. Similarly, the appointment of the temporary receiver, which was also continued by the trial court, is characterized as authorizing the management and control "of the assets of the respective businesses." Id. Because the scope of these rulings was in fact much broader,[15] reaching assets of the in personam defendants beyond those assets listed as defendants in rem and constituting an " 'end run' around our holding in *Cisco* [*v. State of Ga.*, 285 Ga. 656 (680 SE2d 831) (2009)]," *Pittman v. State of Ga.*, 288 Ga. 589, 594 (706 SE2d 398) (2011) (Hunstein, C. J., concurring), I must dissent. Unlike the majority, I simply cannot turn a blind eye to the blatant and intentional use of OCGA § 16-14-6 (a) in a manner that results in the same type of criminal sanction that we found unconstitutional in *Cisco*, supra.

---

[14] The defendants enumerate as error the trial court's orders entered on June 24, 2010, which denied their motions of May 19, 2010 "to Require Supersedeas Bond," although primarily premised on OCGA § 16-14-6 (b). However, the cases below are not final, and such motions are not those from which denials are directly appealable. See OCGA § 5-6-34 (a). While the defendants had the right to direct appeals from the April 19, 2010 orders granting the interlocutory injunctions, see OCGA § 5-6-34 (a) (4), they filed their corresponding notices of appeal on May 14, 2010. Clearly, the June 24, 2010 order was "not prior to or contemporaneous with that [directly appealable] judgment." *Norman v. Ault*, 287 Ga. 324, 331 (6) (695 SE2d 633) (2010). "Judgments cannot be considered on appeal if rendered subsequent to the judgment appealed from." Id. (Citation and punctuation omitted.) On June 30, 2010, the defendants filed an "Amended Notice of Appeal," which added to the list of orders to be appealed, the June 24, 2010 orders. However, this amended notice of appeal was not within 30 days of an appealable order. See OCGA § 5-6-38 (a). Thus, the enumerations of error based on the orders of June 24, 2010, are "not predicated upon . . . proper and timely appeal[s] from [an] appealable order which encompasses [the] subsequent ruling. Accordingly, we have no jurisdiction to consider [them]." *Norman*, supra (Citation and punctuation omitted.)

[15] The trial court's order enjoined the in personam defendants from, inter alia, using or disposing of any assets sought to be forfeited by the State. In its complaint, the State sought the forfeiture of property that "includes, but is not limited to, the property listed as [defendants in rem]." This encompasses all of the in personam defendants' assets, not just the assets of their respective businesses.

DECIDED JULY 5, 2011.

*Bryant & Cook, Malcolm F. Bryant, Jr., Paul K. Cook*, for appellants.

*S. Hayward Altman, District Attorney, Michael G. Lampros, Andrew J. Ekonomou*, for appellees.